***Erin Booker v. The Kroger Co., John Doe***
***USDC, Northern District, Atlanta Division***
***Civil Action File Number: 1:26-cv-02006-SDG***

# EXHIBIT F:
# Karim Vellani's Expert Report

THREAT ANALYSIS GROUP

August 27, 2026

Nicholas D. Bedford, Partner
M. Ryan Del Campo, Partner
Gray, Rust, Moffett & Brieske LLP
950 East Paces Ferry Road NE, Suite 1700
Atlanta, GA 30326

Re: Erin Booker v. The Kroger Co. and John Doe, Civil Action File No. 1:26-cv-02006-SDG, in the United States District Court for the Northern District of Georgia, Atlanta Division.

Dear Mr. Bedford and Mr. Del Campo:

Please find attached my report in the above referenced matter. This report may be supplemented as additional discovery is made available and other case activity is completed.

In arriving at my opinions in this case, I adhered to the consensus-based, published, and peer-reviewed *Forensic Methodology* (Appendix B) promulgated by the International Association of Professional Security Consultants.

Respectfully submitted,

Karim H. Vellani, CPP, CSC

## Table of Contents

**MATERIALS REVIEWED** .... 3

**BACKGROUND** .... 5
Violent Crime Typology .... 5

**CRIME RISK** .... 7
Recency and Proximity .... 7
Similarity and Frequency .... 12
Calls for Service vs. Crimes .... 16
Analysis of Crime at Kroger Store No. 488 .... 17
Analysis of Crime in the "Area" .... 18
Publicity .... 18
Inherent Threats .... 19

**CRIME PREVENTION** .... 20
The Evolution of Crime Prevention .... 20
Crime Prevention Modalities .... 22
The Problem Analysis Triangle .... 23
Kroger Store No. 488 Security Measures .... 24
Security Officer Functions .... 26

**OPINIONS** .... 28

**APPENDIX A: Curriculum Vitae of Karim Vellani** .... 30

**APPENDIX B: Forensic Methodology** .... 45

## MATERIALS REVIEWED

I received and reviewed the materials listed below:

1. Complaint
2. DeKalb County Police Department Offense/Incident Report Number 24-042606 (Bates DEF KROGER000412 – 000413)
3. Statement of Erin Booker (Bates DEF KROGER 000001 – 000018)
4. Associate Handbook Excerpts (Bates DEF KROGER 000381 - 000382)
5. E911 Incident Report (Bates DEF KROGER 000415 – 000417)
6. E911 Audio (Bates DEF KROGER 000420 – 000421)
7. Associate Handbook, Atlanta Division (Bates DEF KROGER 000425 – 000510)
8. Erin Booker Personnel File (Bates DEF KROGER 000511 – 000520)
9. Training Logs (Bates DEF KROGER 000521 – 000523)
10. Store Level Personnel File (Bates DEF KROGER 000529 – l000565)
11. Kroger Incident Reports (Bates DEF KROGER 000566 – 000569, 000604 – 000618)
12. Cap Risk Index (Bates DEF KROGER 000687 – 000695)
13. Vets Securing America Documents:
    a. Contract
    b. Post Orders
    c. Schedule
    d. Time Clock Records
    e. Reports
14. Kroger Uniformed Security Officer Post Orders

In addition to reviewing the foregoing materials, and consistent with the International Association of Professional Security Consultants' *Forensic Methodology*, I independently

requested crime records from the DeKalb County Police Department for Kroger Store No. 488 and the surrounding area. The crime records I independently obtained are linked below.

https://www.dropbox.com/scl/fi/0vh7k40iteov7wyste65m/stats.zip?rlkey=7kypj52wewcmzc2u6zlf9g1u6&dl=0

Conducting interviews with individuals knowledgeable about the security of a subject property is consistent with both my standard practice when performing security risk assessments outside of litigation and with the International Association of Professional Security Consultants' *Forensic Methodology*[1] applied when assessing properties involved in litigation. Interviews are a recognized and essential component of a security risk assessment, providing site-specific knowledge, institutional history, and operational context that cannot be obtained through document review alone. The information learned from the interview is then corroborated and contrasted with other evidence available in this matter including publicly available information, crime records, depositions, documents, observations, and applicable industry standards.

To date, personnel associated with Kroger have not been deposed in this matter. To obtain the necessary information for this report, I interviewed Scotlon Hughes (Kroger Asset Protection) on July 1, 2026 and Harrison Fair (Kroger Manager on Duty on the date of the incident) on August 5, 2026. Where possible, the information obtained from the interview were corroborated with the discovery responses in this matter and other material requested and provided by counsel for The Kroger Co.. The information may be further corroborated when Kroger personnel are deposed in this matter. Findings based on these interviews are cited in this report, separately, as *Hughes Interview, 7/1/2026* and *Fair Interview, 8/5/2026*.

[1] See Appendix B

## BACKGROUND

Erin Booker alleges three incidents of unwanted sexual contact by an unidentified male (now alleged to be Dontavius Shurrod Smith/Dontae B. Smith) while she worked as a produce clerk at Kroger Store No. 488. All three incidents reportedly occurred inside the store: Aisle 10 (on or about May 2023), Aisle 2 (April 27, 2024), and an unspecified aisle near an endcap (May 30, 2024). Only the third incident was reported to store security and management contemporaneously and only the third was reported to police by Ms. Booker. On May 30, 2024, store security located the suspect on video and escorted him from the store. DeKalb County Police Department responded and documented the incident in Offense/Incident Report No. 24-042606.

### Violent Crime Typology

The Violent Crime Typology[2] identifies four types of violence—Predatory, Dispute-Related, Targeted, and Risk-Detached—each with distinct situational characteristics and threat assessment requirements.

- ***Predatory Violence*** involves deliberate, instrumental acts committed to achieve a specific goal, such as money, possessions, or power. These offenses, including robberies and carjackings, are typically premeditated and impersonal, with offenders motivated by gain rather than emotion. Threat assessment for predatory violence focuses on identifying situational risks such as vulnerable locations, times, or targets. Prevention relies on deterrence through increased guardianship, surveillance, and environmental design measures. When threats arise, rapid reporting and coordination with law enforcement are critical to minimizing opportunities for the offender.

- ***Dispute-Related Violence*** emerges from interpersonal conflict and emotion-driven reactions, often in the heat of the moment. Examples include domestic violence, bar fights, and gang retaliation. Because these acts are expressive and impulsive, they are less easily deterred by traditional security measures. Threat assessment should validate threats, determine their immediacy, and consider the emotional and relational context of those involved. Responses may include de-escalation or mediation efforts, relocating potential victims, or calling law enforcement when violence is imminent. Preventive measures often focus on awareness, conflict resolution training, and monitoring known disputes before they escalate.

- ***Targeted Violence*** is premeditated and directed toward specific individuals, groups, or institutions, usually motivated by grievance, ideology, revenge, or the desire for notoriety. Offenders plan carefully and may communicate their intent through social media or other channels. Effective threat assessment requires gathering intelligence to validate threats, identifying behavioral indicators such as "leakage," and sharing

[2] Vellani, Karim; Kaufer, Steve; & Army, Christine (2024). A Refined Violent Crime Typology: Analyzing and Solving Specific Types of Violence. ASU Center for Problem-Oriented Policing.

information within the organization and with external partners like law enforcement. Response strategies should enhance security around potential targets, strengthen existing prevention policies, and ensure timely coordination and recovery planning after an incident.

- ***Risk-Detached Violence*** occurs when offenders act with little or no concern for personal consequences, often due to mental illness, suicidal intent, or extreme ideological motivation. This category includes mass shootings, suicide-by-cop incidents, and lone-actor attacks. Because these offenders are detached from risk, they are least likely to be deterred. Threat assessment emphasizes early detection through the "Pathway to Violence," which includes stages such as grievance, ideation, planning, and preparation. Practitioners should monitor for "leakage" of violent intent, validate threats, and coordinate immediately with law enforcement. Security measures should be implemented swiftly, and response plans should include post-incident recovery and support for affected individuals.

Based on the currently available evidence, the Subject Incident can be classified as *Predatory Violence* or *Risk-Detached Violence*. Understanding the nature of the crime helps determine whether common retail security measures could have prevented it.

## CRIME RISK

As a security consultant and crime analyst with over 30 years of experience, I have developed specialized expertise in crime analysis and related methodologies. Drawing on this expertise, I have conducted crime risk assessments for private companies, industry groups, and government agencies. I have presented at industry conferences and authored three books, as well as book chapters, articles, and journal papers on crime analysis and security risk mitigation (refer to Appendix A: Curriculum Vitae of Karim Vellani).

In line with my education, training, and professional experience, I applied the Uniform Crime Reporting (UCR) methodology, originally developed by the FBI in 1929, to evaluate crime risk at Kroger Store No. 488. This methodology is widely used by criminologists, security consultants, crime analysts, researchers, and organizations for crime risk assessment and is cited in the peer-reviewed, consensus-based *Forensic Methodology* published by the International Association of Professional Security Consultants (IAPSC).

Analyzing situational and contextual factors in crime is essential for understanding risk patterns (problem analysis) and evaluating the opportunity structures and risk factors that contribute to violence (problem-solving). This comprehensive approach aids in assessing whether the standard of care was upheld or breached.

To evaluate the crime risk at Kroger Store No. 488 ("Subject Place"), I analyzed four key factors: **similarity**, **frequency**, **recency**, and **proximity**. This assessment was further guided by industry-accepted practices and authoritative governmental sources.

### Recency and Proximity

The *Forensic Methodology* addresses both time (**recency**) and distance (**proximity**) in assessing crime at a Place (the Subject Place at issue in this matter is Kroger Store No. 488), specifically:

> When assessing actual threats, the following may be considered *as deemed relevant by the security expert*:
>
> a. Relevant crimes on the **subject property** for a **three to five-year period** prior to the date of the incident.
>
> b. Relevant crimes in the **immediate vicinity** of the subject property for a **three to five-year period** prior to the date of the incident.[3]

[3] See Appendix B (bold added)

When evaluating current or future crime risk, incidents that occurred further back in time are less relevant because the relationship between past and future offenses is temporally sensitive. Empirical research consistently shows that the likelihood of repeat or nearby crimes declines sharply over time, a phenomenon known as temporal decay or the near-repeat effect. Studies demonstrate that risk is highest within days or weeks following a prior event and diminishes rapidly thereafter.[4] [5] As environmental and social conditions evolve—through tenant turnover, business changes, physical improvements, or shifts in routine activities—the opportunity structures that supported earlier crimes often no longer exist.[6] Consequently, the predictive value of older incidents decreases substantially. Best practices in crime analysis and security risk assessment therefore prioritize recent data, as these incidents more accurately reflect ongoing offender behavior and situational vulnerabilities.[7] [8] [9] Relying heavily on outdated crime data may misrepresent current risk levels and result in disproportionate or misaligned security measures.

In practice, I typically review the three calendar years leading up to the incident and the incident year up to the incident date. However, this timeframe may vary if additional periods are available through discovery or if police departments are unable to provide the entire requested timeframe.

With regard to area crime (**proximity**), the *Forensic Methodology* further states:

a. *There is no single definition of what constitutes an "immediate vicinity" or "neighborhood" around a given property. Often what is available for evaluation from a law enforcement agency depends upon that agency's software programming and/or staff capabilities (e.g., the agency can only provide data for a set size of an area, such as a quarter mile radius).*

---

[4] Johnson, S. D., & Bowers, K. J. (2004). The stability of space–time clusters of burglary. British Journal of Criminology, 44(1), 55–65.

[5] Johnson, S. D., Bowers, K. J., & Pease, K. (2005). Predicting the future or summarizing the past? Crime mapping as anticipation. In A. Hirschfield & K. Bowers (Eds.), Mapping and analysing crime data: Lessons from research and practice (pp. 179–197). CRC Press.

[6] Brantingham, P. L., & Brantingham, P. J. (1993). Environment, routine, and situation: Toward a pattern theory of crime. In R. Clarke & M. Felson (Eds.), Routine Activity and Rational Choice (pp. 259–294). Transaction Publishers.

[7] Bowers, K. J., Johnson, S. D., & Pease, K. (2004). Prospective hot-spotting: The future of crime mapping? British Journal of Criminology, 44(5), 641–658.

[8] Clarke, R. V., & Eck, J. E. (2005). Crime analysis for problem solvers in 60 small steps. U.S. Department of Justice, Office of Community Oriented Policing Services.

[9] Eck, J. E., & Weisburd, D. (1995). Crime places in crime theory. In J. E. Eck & D. Weisburd (Eds.), Crime and place (pp. 1–33). Criminal Justice Press.

b. *The IAPSC recognizes that criminology studies and related research have generally found that crime in the area may not be relevant to the subject property.*[10]

Advancements in data collection by law enforcement agencies have generated a vast resource for researchers to analyze. Empirical studies of this data have led to the development of three foundational "laws of criminology."

> ***First***, *young people—roughly from age 15 through 25—create most of the trouble.* ***Second***, *males cause more trouble than females regardless of age.* ***Third***, *crime is highly concentrated at a few places. This means that even within high-crime areas, like neighborhoods, only a tiny number of places experience crime. There are no known exceptions to this law, unlike the first two laws.*[11]

In criminological research, there is no universally accepted definition of terms like "neighborhood," "area," "immediate area," "immediate vicinity," or "close proximity" (collectively referred to here as "Area").[12] The concept of a "high crime neighborhood" can be misleading, as it assumes that crime-generating factors operate uniformly across the entire Area. If this were the case, crime would be evenly distributed throughout the neighborhood or area. However, this is not accurate. Crime within an Area, such as a neighborhood, is not uniformly spread; certain locations within a neighborhood experience high crime, while most locations have little to no crime. This uneven distribution occurs in both "good" and "bad" neighborhoods alike.

*Routine Activity Theory* is useful for explaining the basic components of crime. It posits that for a crime to occur, three elements must converge in time: a motivated offender, a target/victim lacking guardianship, and a ***Place***.[13] This is illustrated in the **inner** triangle of the Problem Analysis Triangle below.

---

[10] See Appendix B

[11] Eck, John E., Shannon J. Linning , Tamara D. Herold (2023). Place Management and Crime: Ownership and Property Rights as a Source of Social Control. SpringerBriefs in Criminology.

[12] Linning, Shannon & Mierzwa, Tyler & Cheung, Jeremy & Eck, John. (2025). What is a neighborhood? A concept consensus review of recent criminological literature. Journal of Criminal Justice. 97. 102370. 10.1016/j.jcrimjus.2025.102370

[13] Cohen, L. E., & Felson, M. (1979). Social Change and Crime Rate Trends: A Routine Activity Approach. American Sociological Review, 44(4), 588–608. https://doi.org/10.2307/2094589




Understanding crime at specific Places is essential for effective crime prevention. Successful crime prevention relies on identifying particular problems and addressing them based on the unique situational characteristics of each property. "Crime-free places are all alike; every crime-prone place is crime-prone in its own way." Extensive research, widely accepted since 1989, supports the findings that (a) crime is highly concentrated in specific Places and (b) crime is situationally specific.[14] [15] [16] [17] [18] [19] [20] [21] [22]

[14] Sherman, L., Gartin, P., & Buerger, M. (1989). Hot spots of predatory crime: Routine activities and the criminology of place. Criminology, 27(1), 27-56. https://doi.org/10.1111/j.1745-9125.1989.tb00862.x

[15] Eck, John E., Shannon J. Linning , Tamara D. Herold (2023). Place Management and Crime: Ownership and Property Rights as a Source of Social Control. SpringerBriefs in Criminology.

[16] Weisburd, David, Elizabeth Groff and Sue-Ming Yang. (2012), The Criminology of Place: Street Segments and Our Understanding of the Crime Problem. Oxford: Oxford University Press.

[17] Madensen, Tamara D. (2010). ""Eck, John E.: Places and the Crime Triangle." Encyclopedia of Criminological Theory, SAGE Publications, Inc., Thousand Oaks.

[18] Madensen, Tamara D. and John E. Eck (2013). "Crime Places and Place Management" in Cullen, F. T., & Wilcox, P. The Oxford Handbook of Criminological Theory. New York, NY: Oxford University Press.

[19] Gotham, K.F. & Kennedy, D.B. Secur J (2019). https://doi.org/10.1057/s41284-019-00218-1

[20] Drawve, Grant & Harris, Casey & Thomas, Shaun & Datta, Jyotishka & Cothren, Jackson. (2020). Current and New Frontiers: Exploring how Place Matters through Arkansas NIBRS Reporting Practices. Crime & Delinquency. 10.1177/0011128720974317.

[21] Weisburd, David, Elizabeth Groff and Sue-Ming Yang. (2012), The Criminology of Place: Street Segments and Our Understanding of the Crime Problem. Oxford: Oxford University Press.

[22] Lee, YongJei & Eck, John. (2023). Measures of Crime concentration for Places and Other Units, in E. R. Groff & C. P. Haberman (Eds.), The Study of Crime and Place: A Methods Handbook, Temple University Press

A Place has five characteristics:

1. It is very small (i.e. one address, one land parcel, one building, etc.);

2. It has a known geographic location;

3. It is contained within defined property boundaries;

4. It serves one general function (e.g. the Place provides housing, sells groceries, serves food, provides healthcare, etc.); and

5. It has an owner who has the authority to legally control the use of the Place, including the power to exercise a broad range of controls over the use of the Place.[23]

Those unfamiliar with criminological research may use a one-mile radius (3.14 square miles) or a two-mile radius (12.57 square miles) around a Place and mistakenly assume that all crime within this Area contributes directly to the crime risk of that specific Place, disregarding factors like population density. Selecting an arbitrary radius can distort crime analysis, leading to either overestimations or underestimations of risk. This practice is sometimes used simply to create visually appealing maps, rather than for accurate analysis. Research has highlighted key issues associated with using such radii:

> *Few physical targets take the shape of a sphere and so most likely will differ from the morphology of radial buffer. The second issue is that buffer zones tend to be uniform, equidistant from the object they are buffering. Using a concentric buffer zone in this way assumes that diffusion takes place in equal distributions around an object. It does not seem likely, however, that crime would be diffused uniformly*.[24]

In short, relying on arbitrary radii disregards research evidence and presents practical challenges for accurately assessing crime **frequency** (as detailed below).

Analyzing crime across large geographic areas does not align with Routine Activity Theory or other principles in *Crime Science*.[25] Examining crime at broader spatial units

[23] Eck, John E. (2018). "Regulation for High-Crime Places: Theory, Evidence, and Principles." The ANNALS of the American Academy of Political and Social Science. Volume 679, Issue 1. Sage Publications.

[24] Murray, R., & Roncek, D. (2008). Measuring diffusion of assaults around bars through radius and agency techniques. Criminal Justice Review, 33(2), 199-220.

[25] Cockbain, E., & Laycock, G. Crime Science. Oxford Research Encyclopedia of Criminology. Retrieved 5 Apr. 2023, from

rather than specific Places may obscure variations in crime at these locations and misrepresent risk levels.[26] Places are "only loosely coupled to their contexts: they have internal mechanisms that allow them to operate mostly independent from their surroundings."[27] As a result, correlations derived from area-wide data can be misleading when applied to conclusions about individual Places.[28]

Furthermore, research shows that crime in an Area is not *additive* to the crime risk of a Place. However, crime in the Area could be *comparative*, that is, a Place could be compared to other similar Places in the Area.[29] For instance, a retail store could be compared to other Area retail stores with similar characteristics (i.e. sells groceries). Likewise, an apartment community could be compared to similar apartment communities in the Area. Apartment community characteristics may include type (e.g., garden-style, mid-rise, high-rise), rental rate (e.g., market or subsidized), size (e.g., number of units), and management style. Comparisons across dissimilar Places, however, are inappropriate. [30] [31] [32]

**Similarity and Frequency**
The U.S. Department of Justice, through the FBI and Bureau of Justice Statistics (BJS), provides guidance on assessing crime **similarity** and **frequency**. The FBI's Uniform Crime Report (UCR) categorizes crimes as violent, property, or disorder.

https://oxfordre.com/criminology/view/10.1093/acrefore/9780190264079.001.0001/acrefore-9780190264079-e-4

[26] Weisburd, David, Elizabeth Groff and Sue-Ming Yang. (2012), The Criminology of Place: Street Segments and Our Understanding of the Crime Problem. Oxford: Oxford University Press.

[27] Madensen, Tamara D. and John E. Eck (2013). "Crime Places and Place Management" in Cullen, F. T., & Wilcox, P. The Oxford Handbook of Criminological Theory. New York, NY: Oxford University Press.

[28] Weisburd, David, et al. (2016), Place Matters: Criminology for the Twenty-First Century. Cambridge: Cambridge University Press.

[29] Weisburd, David, et al. (2016), Place Matters: Criminology for the Twenty-First Century. Cambridge: Cambridge University Press.

[30] Bruinsma, G., Johnson, S., Eck, J., & Madensen, T. (2018-09-14). Place Management. In The Oxford Handbook of Environmental Criminology. : Oxford University Press.

[31] Eck, John & Guerette, Rob. (2012). "Own the Place, Own the Crime" Prevention. 10.1093/acprof:oso/9780199917938.003.0021.

[32] Vellani, Karim H. (2021). Unraveled: An Evidence-Based Approach to Understanding and Preventing Crime. Sugar Land, TX: Threat Analysis Group, LLC.

Crimes similar to the Subject Incident generally fall under violent crime which includes murder, rape, robbery, and aggravated assault and assaults (a disorder crime).[33] [34] However, more detail is needed for a full understanding of crime patterns. Disaggregating violence and assaults allows for a more nuanced understanding of the opportunity structures and risk factors associated with the different forms of violence, ultimately guiding more effective crime prevention strategies tailored to specific situations and locations.[35] [36] [37]

Criminologists Ronald V. Clarke and John E. Eck emphasize that “problems need to be examined with great specificity because small details can make a difference between a set of circumstances that gives rise to harmful events, and a set of circumstances producing harmless events.”[38] Regarding *similarity*, Drs. Eck and Clarke state:

> *Similarity. The recurring events must have something in common. They may be committed by the same person, happen to the same type of victim, occur in the same types of locations, take place in similar circumstances, involve the same type of weapon, or have one or more other factors in common. Without common features, you have an arbitrary collection of events, not a problem. Common crime classifications—such as used by the Uniform Crime Reports—are not helpful. Vehicle theft, for example, includes joyriding, thefts for chop shops, thefts for export to other countries, thefts for use in other crimes, and a host of other dissimilar events. So a cluster of vehicle thefts may not be a single problem. More information is needed. With common features, we have a pattern of events that could indicate a problem—for example, thefts of minivans in suburban neighborhoods to be used as gypsy cabs in the inner city*.[39]

---

[33] https://ucr.fbi.gov/

[34] A recent enhancement to the UCR’s underlying reporting system added a category called crimes against society and added additional crimes to the former categories (e.g. human trafficking). The new enhancements have not been fully operationalized across the country.

[35] Newton, A., & Felson, M. (2015). Editorial: Crime patterns in time and space: The dynamics of crime opportunities in urban areas. Crime Science, 4(1). doi:10.1186/s40163-015-0025-6

[36] Irvin-Erickson, Y. (2014). Identifying risky places for crime: An analysis of the criminogenic spatiotemporal influences of landscape features on street robberies (Unpublished doctoral dissertation, 2014).

[37] Haberman, C. P., & J.H. Ratcliffe (2015). Testing for temporally differentiated relationships among potentially criminogenic places and census block street robbery counts. Criminology, 53(3), 457-483. doi:10.1111/1745-9125.12076

[38] Clarke, R. V., & Eck, J. E. (2016). Crime analysis for problem solvers in 60 small steps. Office of Community Oriented Policing Services.

[39] Clarke, R. V., & Eck, J. E. (2016). Crime analysis for problem solvers in 60 small steps. Office of Community Oriented Policing Services.

The FBI defines property crimes as burglary, theft, auto theft, and arson, which differ significantly from violent crimes and are not reliable indicators for assessing violent crime risk. Property crimes, disorder crimes (e.g., criminal mischief), and non-crimes (e.g., found person) should be excluded from analyses focused on violent crime risks, as research shows low escalation rates from property to violent crimes.[40] [41] Thus, in retrospective assessments (such as those required by the Forensic Methodology), property crimes are unnecessary for evaluating violent crime risks, as any escalation is already reflected in violent crime records.

The Forensic Methodology states, “The expert may consider the relationship between offenders and victims (e.g. interpersonal, domestic, targeted, etc.).” In assessing a Place's crime risk, it’s essential to differentiate between crimes that threaten the general public and those targeting specific individuals. The Department of Justice categorizes crimes by the offender-victim relationship into two types:[42] [43] [44]

a. "Stranger" (also known as “Stranger-Initiated”) is a classification of the victim's relationship to the offender for crimes involving direct contact between the two. Incidents are classified as involving strangers if the victim identifies the offender as a stranger, did not see or recognize the offender, or knew the offender only by sight. Crimes involving multiple offenders are classified as involving non-strangers if any of the offenders was a non-stranger. Since victims of theft without contact rarely see the offender, no distinction is made between strangers and non-strangers for the crime.

b. "Non-Stranger" (also known as “Interpersonal”) is a classification of a crime victim's relationship to the offender. An offender who is either related to, well known to, or casually acquainted with the victim is a non-stranger. For crimes with more than one offender, if any of the offenders are non-strangers, then the group of offenders as a whole is classified as non-stranger. This category only applies to crimes which

---

[40] Sherman, Lawrence W. (1989). Violent Stranger Crime at a Large Hotel: A Case Study in Risk Assessment. Security Journal 1:40-46.

[41] Vellani, Karim H. (2021). Unraveled: An Evidence-Based Approach to Understanding and Preventing Crime. Sugar Land, TX: Threat Analysis Group, LLC.

[42] Vellani, Karim; Kaufer, Steve; & Army, Christine (2024). A Refined Violent Crime Typology: Analyzing and Solving Specific Types of Violence. ASU Center for Problem Oriented Policing. https://popcenter.asu.edu/sites/default/files/a_refined_violent_crime_typology_vellani_et_al_2024.pdf

[43] Vellani, Karim H. (2021). Unraveled: An Evidence-Based Approach to Understanding and Preventing Crime. Sugar Land, TX: Threat Analysis Group, LLC.

[44] Bureau of Justice Statistics. (n.d.). Glossary: Stranger; Nonstranger. U.S. Department of Justice. https://bjs.ojp.gov/glossary

involve contact between the victim and the offender; the distinction is not made for crimes of theft since victims of this offense rarely see the offenders.

Domestic violence and other non-stranger crimes are often not suppressible because they typically occur in areas that are not observable by Police Officers, Security Officers, and other guardians.

Non-Stranger crimes, such as domestic violence, are harder to prevent than Stranger crimes, as typical security measures are often ineffective against them.[45] These crimes usually occur in private, unobservable spaces, making them challenging to prevent. Therefore, when assessing crime risk at a Place, only prior Stranger violent crimes should be considered to gauge general crime risk.[46] [47] Criminologist Lawrence W. Sherman states:

> *A standard distinction among violent crimes is the relationship between the victim and the offender. In a crime where the victim and the offender are acquainted, as in a wife-beating, its occurrence may be predictable from their relationship. It is not usually predictable as to place of occurrence, however, especially in public places. There is apparently no reasonable way for the operator of a business to foresee that previously acquainted persons will enter the premises and commit violent acts against each other.*[48]

No scientific basis exists for predicting stranger violent crimes based on prior non-stranger violence.[49]

**Frequency** is typically measured through crime patterns, trends, and rates:

---

[45] Vellani, Karim; Kaufer, Steve; & Army, Christine (2024). A Refined Violent Crime Typology: Analyzing and Solving Specific Types of Violence. ASU Center for Problem Oriented Policing. https://popcenter.asu.edu/sites/default/files/a_refined_violent_crime_typology_vellani_et_al_2024.pdf

[46] St. Jean, Peter K. C.. (2007). Pockets of Crime: Broken Windows, Collective Efficacy, and the Criminal Point of View. University of Chicago Press. https://doi.org/10.7208/chicago/9780226775005.001.0001

[47] Dahmann, J. S. (1975). Examination of police patrol effectiveness-high impact anti-crime program. National Institute of Law Enforcement and Criminal Justice, U.S. Department of Justice.

[48] Sherman, Lawrence W. (1989). Violent Stranger Crime at a Large Hotel: A Case Study in Risk Assessment. Security Journal 1:40-46.

[49] Sherman, Lawrence W. (1989). Violent Stranger Crime at a Large Hotel: A Case Study in Risk Assessment. Security Journal 1:40-46.

- Crime Pattern - two or more incidents related by a common causal factor, usually to do with the offender, location, or target. Patterns are usually, but not always, short term phenomena.[50]

- Crime Trend - a specific type of pattern that has a general direction or tendency. In practice, a trend often has a time component (e.g. crime by day or week, time of day, etc.) and is represented as an increase or a decrease in a given phenomenon over time.[51]

- Crime Rate - the ratio of crimes in an area to the population of that area. Crime rates are typically expressed per 1,000 population per year. A crime rate provides context to a crime volume.[52] "A rate of anything consists of two numbers: the numerator, or number of occurrences, and the denominator, or number of units in which the occurrences are possible. Thus, auto accident rates are sometimes described in terms of accidents per 100,000 vehicle miles traveled and plane crash deaths are divided by the number of passenger miles traveled."[53]

**Calls for Service vs. Crimes**

The *Forensic Methodology* mandates the use of Offense/Incident Reports **and** expressly prohibits relying solely on Calls for Service (CFS). The *Forensic Methodology* states:

> *When assessing relevant crimes, Calls for Service should not be used alone. Offense/Incident Reports are necessary to validate the Calls for Service or dispatch logs, specifically the crime type, crime location, and whether a crime actually occurred. Calls for Service alone, in many jurisdictions, are insufficient for these three elements.*

The International Association of Crime Analysts reinforces that CFS are not a reliable indicator of crime, noting that "it is very problematic to use calls for service as a proxy for crime data."[54]

CFS encompass every report of crime, suspected crime, or activity phoned in to the police from a given location. A single incident may generate multiple CFS entries, and many

---

[50] International Association of Crime Analysts (2009). Exploring Crime Analysis, Second Edition. Overland Park: International Association of Crime Analysts.

[51] Police Executive Research Forum

[52] Vellani, Karim H. and Joel D. Nahoun (2001). Applied Crime Analysis. Woburn: Butterworth-Heinemann.

[53] Sherman, Lawrence W. (1989). Violent Stranger Crime at a Large Hotel: A Case Study in Risk Assessment. Security Journal 1:40-46.

[54] International Association of Crime Analysts (2009). Exploring Crime Analysis, Second Edition. Overland Park: International Association of Crime Analysts.

calls involve non-criminal matters such as missing children, traffic accidents, noise complaints, or parking violations. In some cases, criminals deliberately place false emergency calls—known as "swatting"—to divert law enforcement resources away from actual crime scenes. Likewise, legitimate callers may exaggerate the urgency of a situation in an effort to receive a quicker response. Importantly, many CFS do not require a police response at all, and research indicates that roughly half of officers' time spent handling CFS is unrelated to crime.[55] [56] [57] [58] [59]

Today, many police departments can provide detailed Offense/Incident data, reducing the need to rely on Calls for Service as a measure of crime. When only CFS data are available, however, it is important to recognize that their accuracy varies widely across jurisdictions. For this reason, CFS should not be used in isolation to assess crime risk. Offense/Incident Reports are necessary to confirm whether a crime actually occurred, to verify its type, nature, and location, and to provide the context needed to interpret CFS data reliably.[60] [61]

DeKalb County Police Department Calls for Service are particularly challenging to rely on without support of Offense/Incident Reports as they include cancelled calls, unfounded incidents, and incorrect incident types.

**Analysis of Crime at Kroger Store No. 488**

Following the Forensic Methodology, I used DeKalb County Police Department Offense/Incident data and Offense/Incident Reports to assess crime risk—specifically stranger violent crime—at Kroger Store No. 488.

[55] Vellani, Karim H. (2021). Unraveled: An Evidence-Based Approach to Understanding and Preventing Crime. Sugar Land, TX: Threat Analysis Group, LLC.

[56] Klinger, D., & Bridges, G. (1997). Measurement error In Calls-For-Service as an indicator of crime. Criminology, 35, 705-726.

[57] Sherman, L.W., & Cambridge University associates. (2020) How to count crime: The Cambridge Harm Index Consensus. Cambridge Journal of Evidence-Based Policing, 4(1-2), 1–14. https://doi.org/10.1007/s41887-020-00043-2

[58] Ratcliffe, J.H. (2021) Policing and public health calls for service in Philadelphia. Crime Sci 10, 5. https://doi.org/10.1186/s40163-021-00141-0

[59] Langton, S., Verlaan, T. & Ruiter, S. Operationalizing deployment time in police calls for service. Crime Sci 12, 20 (2023). https://doi.org/10.1186/s40163-023-00198-z

[60] Vellani, Karim H. and Joel D. Nahoun (2001). Applied Crime Analysis. Woburn: Butterworth-Heinemann

[61] Vellani, Karim H. (2021). Unraveled: An Evidence-Based Approach to Understanding and Preventing Crime. Sugar Land, TX: Threat Analysis Group, LLC.

I analyzed all crime records provided and requested additional data from DeKalb County Police Department for Kroger Store No. 488. The crime records can be downloaded using the earlier link in this report.

The table linked below summarizes Offense/Incident data at Kroger Store No. 488 from January 1, 2021, to May 30, 2024. Violent crimes, assaults, and trespass incidents were validated with Offense/Incident Reports. Non-stranger incidents (e.g., domestic violence) are highlighted in peach, simple assaults in blue, trespassing incidents in brown, and prior stranger violent crimes in red. The subject incident is highlighted in green.

https://www.dropbox.com/scl/fi/vqp38ixv2rv250ko9qk1i/Incidents.pdf?rlkey=f82om7w3bwowz3x2uu38jqzft&dl=0

Prior to the Booker incident, there was one sexual battery report in the dataset (3+ years). That incident, from April 2021, involved an employee grabbing a coworker's buttocks. This was a non-stranger workplace incident, not a stranger-perpetrated assault, and is distinguishable from the Booker incident. No prior DeKalb County Police Department report reflects a stranger entering the store and engaging in unwanted sexual contact with an employee or customer.

**Analysis of Crime in the "Area"**

Comparing Kroger Store No. 488 to arbitrary areas lacks criminological support. A useful comparison could involve other retail stores if population data (customer counts) were available to calculate crime rates; however, these figures are unknown. There is no evidence that any historical crimes in the area "spilled over" from other Places and increased the risk of violence at Kroger Store No. 488.[62] [63] [64] Kroger Store No. 488 was not a chronic crime location. It does not appear in the data as a repeat address, a hot spot, or a place with an established pattern of violent incidents. Conflating it with the high-crime addresses captured within an overbroad search radius is not a conclusion the evidence supports. It is a product of the methodology chosen.

**Publicity**

**Publicity** is usually assessed based on non-police records, such as testimony, news media reports, internal reports, etc. Based on the available discovery in this matter, there is no evidence Kroger was aware of the first incident (May, 2023) involving Ms. Booker

---

[62] Ratcliffe, J. H., & Breen, C. (2011). Crime diffusion and displacement: Measuring the side effects of police operations. The Professional Geographer, 63(2), 230-243.

[63] Weisburd, D., Groff, E., & Yang, S-M. (2012), The criminology of place: Street segments and our understanding of the crime problem. Oxford University Press.

[64] Guerette, R. T. (2009). Analyzing crime displacement and diffusion. Problem-oriented guides for police: Problem-solving tools series (No. 10). Center for Problem-Oriented Policing. U. S. Department of Justice. https://portal.cops.usdoj.gov/resourcecenter/content.ashx/cops-p167-pub.pdf

and the perpetrator. Kroger was aware of the second incident (April 27, 2024), but an Incident Report was not written.

**Inherent Threats**

The analysis I conducted included the assessment of inherent threats as required by the *Forensic Methodology.* Inherent threats consider "the crime risk at the subject property as determined by the expert based on the property's characteristics, the expert's research and/or experience in similar environments, information gathered through the discovery process, and/or a site inspection (if conducted)." Sexual Battery, against employees, at retail stores are not an inherent threat.[65]

[65] FBI Crime Data Explorer https://cde.ucr.cjis.gov/

## CRIME PREVENTION

### The Evolution of Crime Prevention

***From Good Ideas to Evidence-Based Practice***

The field of crime prevention and security management has undergone a significant professional evolution over the past several decades. Early approaches to security were largely intuitive (e.g. rolling a boulder in front of the cave entrance), driven by individual judgment, institutional custom, or the perceived good ideas of those responsible for protecting assets. While well-intentioned, these approaches lacked systematic grounding and produced inconsistent outcomes across properties and environments.

As the security profession organized itself through bodies such as ASIS International, the field entered a second phase: the development of consensus-based standards and guidelines. Through structured technical committee processes, practitioners and subject matter experts codified collective professional knowledge into documented frameworks (e.g. ASIS Protection of Assets,[66] NFPA 730 (Guide for Premises Security),[67] and Crime Prevention Through Environmental Design (CPTED) design guidelines developed in collaboration with urban planners and criminologists.[68] These consensus-based documents established a shared baseline of expectation for deploying security across a range of property types.

The current and most rigorous phase of this evolution is the integration of evidence-based practice, the application of empirical research findings to security decision-making.[69] Drawing on peer-reviewed criminological literature, place-based crime research, and systematic reviews of intervention effectiveness, evidence-based security practice moves beyond what practitioners believe works to what research demonstrates works. The contributions of environmental criminology, particularly routine activity theory,[70] crime

---

[66]ASIS International. Protection of Assets (POA) standards. Alexandria, VA: ASIS International.

[67]National Fire Protection Association. (2019). NFPA 730: Guide for Premises Security. Quincy, MA: NFPA.

[68]Crime Prevention Through Environmental Design (CPTED) principles were developed through collaborative work between security practitioners and urban planners, synthesizing foundational work by C. Ray Jeffery and Oscar Newman.

[69] Vellani, K. (2021). Unraveled: An Evidence-Based Approach to Understanding and Preventing Crime. Threat Analysis Group, LLC.

[70]Cohen, L. E., & Felson, M. (1979). Social change and crime rate trends: A routine activity approach. American Sociological Review, 44(4), 588–608.

pattern theory,[71] and rational choice theory[72] resulted in practical crime prevention frameworks, including the problem analysis triangle, risky facilities, and situational crime prevention. These theories and frameworks now inform how competent security professionals assess risk, recommend countermeasures, and evaluate the adequacy of security programs. This shift is not merely academic; it defines the contemporary approach to security decision-making.

***Cameras as a Case Study***
The rapid proliferation of video surveillance (i.e. CCTV) offers an instructive parallel to the current state of violence prevention and a cautionary lesson about the gap between consensus and evidence. Beginning in the 1990s, the United Kingdom embarked on one of the most aggressive public-space surveillance deployments in history, driven by political momentum and public intuition rather than empirical validation. Three quarters of the Home Office crime prevention budget was allocated to video surveillance related projects between 1996 and 1998,[73] producing explosive growth in camera systems across British cities and towns. The United States followed a similar trajectory. In neither country had the underlying assumption, that camera presence deters crime, been subjected to rigorous empirical testing before deployment began at scale.[74]

When researchers eventually evaluated these investments, the results revealed a technology whose effectiveness was far more conditional than its consensus adoption had assumed. The first systematic review by Welsh and Farrington (2002) found that across 22 evaluations, the overall crime reduction attributable to video surveillance was a modest 4%, and all five North American studies showed no evidence of any desirable effect whatsoever.[75] The landmark 40-year meta-analysis by Piza, Welsh, Farrington, and Thomas (2019), synthesizing 161 evaluations, confirmed a modest overall effect, but the distribution of that effect told the more important story. Effectiveness varied dramatically across settings, with cameras performing strongest in car parks and substantially weaker in city and town centers, public housing, and public transit,[76] precisely the settings where

---

[71] Brantingham, P. J., & Brantingham, P. L. (1981). Environmental criminology. Beverly Hills, CA: Sage Publications.

[72] Clarke, R. V. (Ed.). (1997). Situational crime prevention: Successful case studies (2nd ed.). Guilderland, NY: Harrow and Heston.

[73] Piza, E. L., Welsh, B. C., Farrington, D. P., & Thomas, A. L. (2019). CCTV surveillance for crime prevention: A 40-year systematic review with meta-analysis. Criminology & Public Policy, 18(1), 135–159.

[74] Painter, K., & Tilley, N. (Eds.). (1999). Surveillance of public space: CCTV, street lighting and crime prevention. Crime Prevention Studies, Vol. 10. Monsey, NY: Criminal Justice Press.

[75] Welsh, B. C., & Farrington, D. P. (2002). Crime prevention effects of closed circuit television: A systematic review. Home Office Research Study No. 252. London: Home Office.

[76] Welsh, B. C., & Farrington, D. P. (2009). Public area CCTV and crime prevention: An updated systematic review and meta-analysis. Justice Quarterly, 26(4), 716–745.

mass deployment had been concentrated. Most critically, there was no evidence of any effect on violent crime and disorder,[77] with measurable reductions limited to vehicle crime and other property offenses.

The lesson is not that cameras are ineffective, it is that they were deployed as general-purpose crime prevention tools before research had established the boundaries of their utility. What consensus adopted as self-evident, evidence later revealed to be place-specific and crime-specific. For places where the primary threat is violence (e.g. assaults and robberies) and disorder (e.g. vice crimes), the video surveillance literature provides no empirical support for the proposition that installation alone reduces that risk.

**Crime Prevention Modalities**

In the security field, three main countermeasures mitigate risks: governance (policies, training, protocols), physical security, and security personnel. Some places rely on governance alone, others combine it with physical security, and some use all three. The security program at Kroger Store No. 488 used all three elements.




[77]College of Policing. (2021). CCTV surveillance for crime prevention: Evidence summary. Ryton-on-Dunsmore: College of Policing. Retrieved from https://www.college.police.uk/research/crime-reduction-toolkit/cctv

Evidence-based security uses research, data, and analysis to guide security decisions. Studies on the effectiveness of crime prevention measures (i.e., their ability to reduce crime) are more valuable than those on their prevalence. While prevalence indicates how common a measure is, effective security means achieving reasonable crime reduction, recognizing that not all crime is preventable.[78] "Even with a very high relative risk of crime, it is possible for security measures to be adequate and reasonable."[79]

**The Problem Analysis Triangle**

The Problem Analysis Triangle provides a framework for understanding both why crime occurs and how it can be prevented. Building on routine activity theory, the Problem Analysis Triangle holds that crime requires the convergence of three elements: a likely offender, a suitable target or victim, and a place.




Corresponding to each element is a controller whose presence and engagement can disrupt that convergence. The handler has a personal relationship with the offender (e.g. a parent, employer, or supervisor) and the knowledge and authority to discourage criminal behavior. When **handlers** are absent or disengaged, that restraining influence is lost. The **guardian** protects the potential target or victim through presence and awareness. Guardianship is not limited to formal security personnel; any capable and attentive person

[78] Tompson , L., Belur, J., Thornton, A., Bowers, K. J., Johnson, S. D., Sidebottom, A., Tilley, N. & Laycock, G. (2020). How strong is the evidence base for crime reduction professionals? Justice Evaluation Journal, 4(1), 68-,97. https://doi.org/10.1080/24751979.2020.1818275

[79] Sherman, Lawrence W. (1989). Violent Stranger Crime at a Large Hotel: A Case Study in Risk Assessment. Security Journal 1:40-46.

who is willing to intervene functions in this role. Most guardianship take the form of self-protective actions an individual takes on their own behalf.[80]

> *"Guardians" should not be mistaken for police officers or security guards, who are very unlikely to be on the spot when a crime occurs, but are formal guardians. The most significant guardians in society are ordinary citizens going about their daily routines— natural guardians. Usually, you are the best possible guardian for your own property. Your friends and relatives also can serve as guardians for you and your property, as you can for theirs. Even strangers can serve as guardians if they are nearby, and the offender thinks they might turn him in or otherwise interfere with his plans.*[81]

The **place manager** is responsible for controlling conditions at a specific location ( a property owner, property manager, or on-site staff). Where the guardian's focus is the target, the place manager's focus is the place itself: its physical environment and the conduct of those who use it. Any one of the three controllers can disrupt crime. Thus, the Problem Analysis Triangle offers both a diagnostic tool for understanding why crime occurred and an evaluative framework for assessing whether those responsible for each control function discharged their role. **Crime prevention is not the exclusive responsibility of any single controller**.[82]

**Kroger Store No. 488 Security Measures**

Kroger used a Security Risk Matrix developed by the Corporate Office (Home Office) to assess the risk at each Kroger store and to deploy security measures responsive to the identified risks. The Risk Matrix includes multiple inputs that result in an overall risk score (output).[83] One of the inputs is a Cap Index score. Kroger Store No. 488's Cap Index score was 444. Cap Index Scores are based on a range of 0 (lowest risk) to 2000 (highest risk). The chart below shows Walmart Store 2201's Cap Index Score in context with the Cap Index range. The Risk Matrix ranked Kroger Store No. 488 with a KCI of D1 in 2023. The overall Risk Category in 2023 was "3 High."

[80] Sampson, R., Eck, J. & Dunham, J. Super controllers and crime prevention: A routine activity explanation of crime prevention success and failure. Secur J 23, 37–51 (2010). https://doi.org/10.1057/sj.2009.17

[81] Felson M. & Eckert M. (2019). Crime and Everyday Life (6th Ed.). SAGE. https://doi.org/10.4135/9781506394817

[82] Cohen, L. E., & Felson, M. (1979). Social Change and Crime Rate Trends: A Routine Activity Approach. American Sociological Review, 44(4), 588–608. https://doi.org/10.2307/2094589

[83] Hughes Interview, 7/1/2026




Incident reports are written for crimes occurring on the property that come to the attention of Kroger management.[84] Kroger can ban individuals as a management action, but this cannot be enforced by the police. If the person is still on-site, management would try to get a Criminal Trespass issued, though police rarely arrives in time. In Atlanta, a typical 911 call involves a 30–45 minute hold time, followed by roughly another hour for an officer to respond to a non-violent incident.[85] [86]

Kroger Store No. 488 was equipped with surveillance cameras. Security Officers were deployed at Kroger Store No. 488, providing 245 weekly hours of coverage. The Security schedule shows staffing levels and hours for Kroger Store No. 488. There were three overlapping shift types:

- Inside Unarmed: 0500–2150 (11.5 hours/day, 115.5 hours/week)
- Inside Armed: 0500–1700 (12 hours/day, 84 hours/week)
- Inside Off-Duty Officer: 1700–2350 (6.5 hours/day, 45.5 hours/week)

Kroger provided Post Orders to the Security Officers. The *Uniformed Security Officer Post Orders* identify three roles for the Security Officer: enhance the customer shopping experience through visible, professional customer service; serve as a visual deterrent to

[84] Fair Interview, 8/5/2026

[85] Hughes Interview, 7/1/2026

[86] Fair Interview, 8/5/2026

criminal activity; and help maintain a safe environment for customers and associates. Officers are posted primarily at the vestibule/entrance area and are directed to make interior rounds roughly every two hours, using unpredictable timing and routes both inside and on exterior/parking lot patrols.

Security Officers were present at the time of the incident. Surveillance video showing the post-incident events indicates at least three Security Officers responding to the Booker incident.

**Security Officer Functions**

Security Officers' duties, limitations, and their impact on crime must be clearly understood to properly assess their actual ability to prevent crimes similar to the subject incident. In retail environments, Security Officers typically operate in *Prevention through Deterrence* mode and *Observe and Report* mode. In retail environments, they rarely operate in *Respond and Control (Intervention)* mode.

- **Prevention through Deterrence**: Security Officers can deter certain crimes simply by their presence. They tend to be more effective against disorder and property crimes but have little to no impact on violent crime. Prior literature has identified only two studies specifically examining the effect of Security Officers on violent crime by way of foot and vehicle patrols. One study found no significant evidence that Security Officers reduced violent, property, or disorder crimes.[87] The other study observed an increase in violent crime following the deployment of Security Officers.[88] A substantial body of research on police officers has shown similar results with some noting that any reduction in violent crime often quickly diminishes during the treatment period.[89] [90] [91] [92]This phenomenon is called *decay*, meaning *diminishing returns after the treatment was implemented*, or that positive effects are short-lived—typically lasting only 6–8 weeks. Prevention through Deterrence is discussed further in the ***Efficacy for Preventing Violent Crimes*** section below.

[87] Lee, G., Hollinger, R. C., & Dabney, D. A. (1999). The relationship between crime and private security at US shopping centers. *American Journal of Criminal Justice*, *23*, 157–177. https://doi.org/10.1007/BF02887270

[88] Fabbri, M., & Klick, J. (2021). The ineffectiveness of 'observe and report' patrols on crime. *International Review of Law and Economics*, *65*, 105972. https://doi.org/10.1016/j.irle.2020.105972

[89] Fabbri, M., & Klick, J. (2021). The ineffectiveness of 'observe and report' patrols on crime. *International Review of Law and Economics*, *65*, 105972. https://doi.org/10.1016/j.irle.2020.105972;

[90] Novak, K. J., Fox, A. M., Carr, C. M., & Spade, D. A. (2016). The efficacy of foot patrol in violent places. Journal of Experimental Criminology, 12, 465–475. https://doi.org/10.1007/s11292-016-9271-1

[91] Ratcliffe, J. H., & Sorg, E. T. (2017). Foot patrol: Rethinking the cornerstone of policing. Springer. 10.1007/978-3-319-65247-4

[92] Rydberg, J., McGarrell, E. F., Norris, A., & Circo, G. (2018). A quasi-experimental synthetic control evaluation of a place-based police-directed patrol intervention on violent crime. Journal of Experimental Criminology, 14, 83-109. https://doi.org/10.1007/s11292-018-9324-8

- **Observe and Report**: Security Officers assigned to retail properties typically operate in an *observe and report* mode. This means that when they witness rule violations or criminal activity, they notify management or the police and document their observations in written or verbal reports.

- **Respond and Control (Intervention)**: Security Officers assigned to retail properties are typically unarmed. Intervening in violent crimes or situations leading up to violence is often dangerous for them. When Security Officers do intervene, it is most commonly in self-defense.[93] [94]

[93] Perez, K. L., Kaufer, S., Silva, M., Vellani, K., & Zajic, A. W. (2025). Place management for apartment crime prevention (EBSP-25-02). International Association of Professional Security Consultants.

[94] Vellani, K. (2026). Strategic Security Management: A Risk Assessment Guide for Decision Makers, Third Edition. Boca Raton, FL: Taylor & Francis CRC Press.

## OPINIONS

My opinions are based on specialized knowledge of evidence-based practices and over 30 years of consulting experience nationwide. As a security consultant and crime analyst, I've developed expertise in security and crime prevention, informed by extensive reviews of security guidelines, standards, best practices, and criminological research relevant to places like Kroger Store No. 488.

I have written three books and numerous articles on crime analysis, security, and prevention, presented at industry conferences, and contributed to the development of security standards for major industry associations. Additionally, I have chaired committees focused on advancing evidence-based research and practices related to the effectiveness of security measures in preventing various crimes. For further details, please refer to my CV (Appendix A).

In forming my opinions on this matter, I adhered to the consensus-based, peer-reviewed Forensic Methodology (Appendix B) developed and published by the International Association of Professional Security Consultants (IAPSC).

For all the reasons set forth throughout this report, my opinions with respect to this matter are as follows:

1. An analysis of the 112 reported incidents from April 2021 through May 30, 2024 demonstrates that third-party sexual battery was unforeseeable at Kroger Store No. 488:

    a. There were zero prior third-party stranger sexual batteries or sexual assaults reported at Kroger Store No. 488.

    b. The single prior sexual battery listed in the 3+ year history (04/02/2021) involved an employee-on-employee event and occurred more than three years prior to the Booker incident.

2. Kroger's notice, prior to May 30, 2024, was limited to an informal and unverified comment from Ms. Booker. It was not based on specific, actionable information that would trigger a heightened response under prevailing security-industry practices.

    a. Erin Booker references two prior unrecorded incidents (May 2023 and April 2024), but neither incident was reported to law enforcement, nor was the suspect identified or formally trespassed by police. When management was alerted, a Security Officer immediately escorted the individual off the property. This was a reasonable operational protocol. Without police identification or an active criminal trespass warning, Kroger had no notice of a specific ongoing danger.

   b. Company policy, as described by Scotlon Hughes, does not require documentation of a "minor" incident absent a detention or an identifiable completed crime. Kroger's practices in this regard are consistent with retail security practices.

3. Kroger met prevailing security practices standards for retail stores:

   a. Physical contact occurring in active retail aisles takes seconds. Covert acts of this nature are fundamentally unpredictable and unpreventable through typical retail security measures.

   b. The subject incident was a brief event that occurred while two to three Security Officers were in Kroger Store No. 488. Kroger maintained a minimum of two contracted security officers (one armed, one unarmed) posted at the two main entrances during all store operating hours, with an additional roving supervisor at times — a staffing level which exceeds reasonable retail security practices for a store of this size and profile.

   c. Kroger Store No. 488 management (Harrison Fair) located the suspect on video. Security Officers located and escorted the suspect from the store. Surveillance footage indicates that Security Officers acted promptly when notified of an incident.

4. In my opinion, the evidence does not support that any security measure reasonably available to Kroger before May 30, 2024, would have prevented the subject incident. Short of assigning a dedicated personal bodyguard to every employee, no reasonable security measure can prevent physical touch in a public grocery store aisle.

5. Kroger met the standard of care with respect to the provision of security measures at Kroger Store No. 488.

**--- End of Report ---**

**I reserve the right to update or supplement this report as additional discovery becomes available and further case activities are completed.**

Respectfully submitted,

Karim H. Vellani, CPP, CSC

## APPENDIX A: Curriculum Vitae of Karim Vellani

### Professional Experience Summary

Karim Vellani is President of Threat Analysis Group, LLC, an independent security consulting firm. Board Certified in Security Management (CPP) and as a Security Consultant (CSC), he has over 30 years of experience in security management. He holds a bachelor's degree in Criminal Justice and a master's degree in Criminal Justice Management. He is the author of *Applied Crime Analysis*, *Strategic Security Management*, and *Unraveled: An Evidence-Based Approach to Understanding and Preventing Crime*, and has contributed to many other security publications and journals. Karim collaborates on research initiatives focused on preventing violent crime, workplace violence, and sex trafficking. As an Adjunct Professor at the University of Houston–Downtown, he taught graduate-level courses in Security Management and Risk Analysis. He has trained police and security officers in firearms use and the application of force and frequently serves as an instructor for professional security organizations.

As an independent security consultant, Karim has advised Fortune 500 companies and government agencies on security risk management and force protection. He regularly consults for government, commercial, and residential sites across the country, with a portfolio including data centers, healthcare facilities, houses of worship, manufacturing plants, financial institutions, retail stores, shopping centers and malls, hotels and motels, office buildings, and residential housing. For 11 years, Karim was responsible for managing the quality control/assurance function for the U.S. Department of Homeland Security's protection force at federal buildings in 23 states.

Karim specializes in crime analysis and security risk assessment. He developed a crime analysis methodology and software application based on the FBI's Uniform Crime Reporting system, enabling users to identify threats, select effective countermeasures, and mitigate risks. First introduced in Applied Crime Analysis and expanded in Unraveled, this methodology has been applied in threat assessments for thousands of facilities. He also created the Security Risk Assessment Methodology for Healthcare Facilities, published by the International Association for Healthcare Security & Safety (IAHSS) in 2009. In 2023, Karim authored the IAHSS Human Trafficking Victim Identification and Response guideline and served on the ASIS International Technical Committee for the Risk Assessment Standard.

Karim is an active member of several professional organizations, including the International Association of Professional Security Consultants (IAPSC), ASIS International, the American Society of Criminology (ASC), the American Society of Evidence-Based Policing (ASEBP), the International Association of Crime Analysts (IACA), the International Association of Chiefs of Police (IACP), and the International Association for Healthcare Security & Safety (IAHSS). He previously served as President of the IAPSC and as Chair of both the IAHSS Foundation's Evidence-Based Research Committee and the IAPSC's Evidence-Based Security Practices Committee. He currently serves as a member of the IAPSC Forensic Committee. In 2025, Karim was honored with the Charles A. Sennewald Distinguished Service Accolade by the IAPSC in recognition of his contributions to the security consulting profession.

## Current Employment

***Threat Analysis Group, LLC***
President & Independent Security Consultant

- Security Metrics & ROI: Conduct ROI analyses for crime prevention investments; perform crime analysis and benchmarking to support data-driven decision-making
- Risk Management: Lead threat and vulnerability assessments; develop quantitative risk models to measure exposure and prioritize mitigation strategies
- Operational Optimization: Develop and refine security policies, staffing models, and procedures; advise on force allocation, procurement, and vendor selection
- Technology Advisory: Provide vendor-independent consultation on access control, intrusion detection, video management, and communications systems
- Research & Innovation: Conduct evidence-based research on crime prevention, with emphasis on threat assessment, violent crime, sex trafficking, and workplace violence

## Past Employment

***University of Houston – Downtown***
Adjunct Professor

- Taught graduate courses in Security Management and Risk Analysis in the Master's Program at the University's College of Criminal Justice..

***Texas One Security***
Operations Manager

- Managed a security force of over 100 officers, overseeing approximately 1,400 guard hours across 17 client sites.
- Directed hiring, training, deployment, scheduling, and performance evaluations to ensure operational effectiveness.
- Ensured full compliance with State Private Security rules and regulations for both personnel and company operations.

***Operational Support Services, Inc.***
Law Enforcement Advisor/Security Consultant

- Provided security consulting services to law enforcement agencies, private security firms, government entities
- Conducted threat and vulnerability assessments to evaluate client risk and inform mitigation strategies

***North Harris College***
Instructor

- Trained police and security officers in firearms use, safety, and qualification standards
- Instructed security personnel on legal topics including use of force, deadly force, and profiling

***Roehling Corporate International Investigations, Inc.***
Private Investigator

- Provided investigative services to the legal profession, insurance companies, and private corporations
- Served on search team for Oklahoma escaped convict Randolph Franklin Dial

## Certifications & Licenses

Board Certified Security Consultant (CSC)
International Association of Professional Security Consultants (IAPSC)

Board Certified in Security Management (CPP)
American Society for Industrial Security - International (ASIS)

Board Certified Protection Officer (CPO)
International Foundation for Protection Officers

Board Certified Police Firearms Instructor
National Rifle Association of America

## Education & Training

Master of Science, Criminal Justice Management, Sam Houston State University, August 1998

Bachelor of Science, Criminal Justice (Specialization in Law Enforcement / Police Science), Sam Houston State University, August 1994

An Analyst's Role in a Homicide Investigation, International Association of Crime Analysts

Certified Protection Officer Course, International Foundation for Protection Officers

Certified Protection Professional Course, American Society for Industrial Security – International

Concealed Handgun Instructor Course, Texas Department of Public Safety

Criminal Profiling in Crime Analysis, International Association of Crime Analysts

Gang Crimes, Montgomery County Sheriff's Department

How Anti-Money Laundering Investigators Follow the Money for Human Trafficking, Houston InfraGard Countering Human Trafficking Cross Sector Council

Identifying and Managing Risky Facilities, International Association of Professional Security Consultants

Identifying Crime and Crash Patterns, Analyst Mastermind Series, International Association of Directors of Law Enforcement

Instructors Course, Texas Commission on Law Enforcement Standards and Education

Introduction to Child Sex Trafficking, National Center for Missing and Exploited Children

Level One Training, Texas Private Security Bureau

Personal Protection and Home Safety Instructor, National Rifle Association of America

Pistol, Rifle and Shotgun Instructor, National Rifle Association of America

Police Firearms Instructor, National Rifle Association of America

Preventing Human Trafficking, Protect All Children from Trafficking (PACT)

**Professional Affiliations**

American Society of Criminology (ASC)

American Society of Evidence-Based Policing (ASEBP)

American Society for Industrial Security - International (ASIS)

Federal Bureau of Investigation (FBI) InfraGard

International Association of Chiefs of Police (IACP)

International Association of Crime Analysts (IACA)

International Association for Healthcare Security & Safety (IAHSS)

International Association of Professional Security Consultants (IAPSC)

**Accomplishments**

Chair, Evidence-Based Security Practices Committee, 2022 - 2025
International Association of Professional Security Consultants (IAPSC)

Member, Forensic Security Committee, 2004 – Present
International Association of Professional Security Consultants (IAPSC)

Chair, Evidence Based Research Committee, 2015 - 2020
International Association of Healthcare Security and Safety Foundation

Member, Board of Directors, 2013 – 2020
International Healthcare Security and Safety Foundation

Member, Use of Force Best Practice Committee, 2019 – 2020
International Association of Professional Security Consultants (IAPSC)

Technical Committee Member, Enterprise Security Risk Management (ESRM) Guideline, 2019 - 2020
American Society for Industrial Security - International (ASIS)

Technical Committee Member, Private Security Officer Selection and Training Guideline, 2017 - 2018
American Society for Industrial Security - International (ASIS)

Member, Security Metrics/Data Task Force, 2016-2019
International Association of Healthcare Security and Safety

Technical Committee Member, Private Security Officer (ANSI Standard), 2015 - 2017
American Society for Industrial Security - International (ASIS)

Member, Board of Directors, 2011 - 2015
International Association of Professional Security Consultants (IAPSC)

Technical Committee Member, Risk Assessment (ANSI Standard), 2013 - 2016
American Society for Industrial Security - International (ASIS)

Chairman, Council on Advocacy, 2011 - 2012
International Association for Healthcare Security & Safety (IAHSS)

Advisory Member, Security Lighting for People, Property, and Critical Infrastructure Guideline (G-1-16), 2011 – 2017
Illuminating Engineering Society of North America (IESNA)

Technical Committee Member, Private Security Company (ANSI Standard), 2012 - 2013
Maturity Model for the Phased Implementation of a Quality Assurance Management System for Private Security Service Providers (PSC.3) Standard
American Society for Industrial Security - International (ASIS)

Technical Committee Member, Private Security Company (ANSI Standard), 2011 - 2012
Conformity Assessment and Auditing Management System for Quality of Private Security Company Operations (PSC.2) Standard
American Society for Industrial Security - International (ASIS)

Technical Committee Member, Private Security Company (ANSI Standard), 2011 – 2012
Management System for Quality of Private Security Company Operations (PSC.1)
American Society for Industrial Security - International (ASIS)

Technical Committee Member, Physical Asset Protection (ANSI Standard), 2011 - 2012
American Society for Industrial Security - International (ASIS)

Immediate Past President, 2009 - 2011
International Association of Professional Security Consultants (IAPSC)

President, 2008 - 2009
International Association of Professional Security Consultants (IAPSC)

Vice President, 2007 - 2008
International Association of Professional Security Consultants (IAPSC)

Secretary, 2006 - 2007
International Association of Professional Security Consultants (IAPSC)

Member, Board of Directors, 2004 - 2006
International Association of Professional Security Consultants (IAPSC)

Chairman, Professional Certification Committee, 2004 - 2006
International Association of Professional Security Consultants (IAPSC)

Member, Private Security Services Council, 2005 – 2006
American Society for Industrial Security - International (ASIS)

Chairman, Certifications Committee, 2004 - 2006
American Society for Industrial Security - International (ASIS) - Houston Chapter

Chairman, By-Laws Committee, 2004
International Association of Professional Security Consultants (IAPSC)

Chairman, Certified Protection Professional Committee, 2002 - 2003
American Society for Industrial Security - International (ASIS) - Houston Chapter

Committee Member, Publications Committee, 2001 - 2002
International Association of Crime Analysts (IACA)

## Publications & Presentations

Vellani, K. (2026). Preventing Crime in Multifamily Housing: Proven Strategies to Reduce Risk, Improve Security & Protect Residents. International Facility Management Association.

Vellani, K. (2026). "Staying Ahead of Violent Crime: Meeting the Standard of Care in Property security." 2026 PropertyCon, Institute of Real Estate Management, Austin, TX, April 9, 2026

Vellani, K. (2026). Strategic Security Management: A Risk Assessment Guide for Decision Makers, Third Edition. Boca Raton, FL: Taylor & Francis CRC Press.

Perez, K. L., Kaufer, S., Silva, M. A., Vellani, K., & Zajic, A. W. (2025). Place Management for Apartment Crime Prevention (EBSP-25-02). Evidence-Based Security Practices, International Association of Professional Security Consultants.

Vellani, K. (2025). "Forensic Methodology – The Gold Standard for Expert Witnesses" (Panelist). Annual Conference, International Association of Professional Security Consultants, San Diego, CA, May 1, 2025.

Vellani, K. Kaufer, S.; & Army, C. (2024). A Refined Violent Crime Typology: Analyzing and Solving Specific Types of Violence. ASU Center for Problem-Oriented Policing.

Vellani, K. (2023). "Transitioning to Evidence-Based Security Practices." ASIS - International. Houston, TX, November 8, 2023.

Vellani, K. (2023). "Using Evidence-Based Research to Understand and Prevent Crime." Evidence-Based Security Practices Committee, International Association of Professional Security Consultants, January 24, 2023.

Army, C. & Vellani, K. (2023). Risky Behaviors and Violent Victimization (EBSP-23-01). Evidence-Based Security Practices, International Association of Professional Security Consultants.

Vellani, K. (2022). "Using Evidence-Based Research to Understand and Prevent Crime." 37th Annual Conference, International Association of Professional Security Consultants, Denver, CO, June 14, 2022.

Vellani, K. (2022). "Assessing Crime Risk." Fundamentals in Forensic Security Consulting, International Association of Professional Security Consultants, Denver, CO, June 13, 2022.

Vellani, K., & Kristof, T.S. (2022). "Security's Critical Role in Combating Sex Trafficking." Journal of Healthcare Protection Management, Volume 76, Number 1, International Association for Healthcare Security & Safety.

Vellani, K. (2021). Unraveled: An Evidence-Based Approach to Understanding and Preventing Crime. Threat Analysis Group, LLC.

Vellani, K. (2021). "Mitigating Security Risks with Evidence-Based Research." Hospital Association of Southern California, November 3, 2021.

Army, C. & Vellani, K. (2021). Violent Crime Typology and Continuum. CrimRxiv. https://doi.org/10.21428/cb6ab371.71ec923d

Vellani, K. & Kristof, T.S. (2021). Identifying and Responding to Sex Trafficking Victims in Healthcare Environments. CrimRxiv. https://doi.org/10.21428/cb6ab371.84ddfc71

Vellani, K. and Kristof, T.S. (2021). "Results of the 2020 Healthcare Crime Survey." Journal of Healthcare Protection Management, Volume 36, Number 1, International Association for Healthcare Security & Safety.

Vellani, K.; Warren, B.; Young, J. (2020). "The Impact of COVID-19 on Healthcare Facilities." International Association of Healthcare Security and Safety, October 28, 2020.

Pompeii, L. A., Benavides, E., Pop, O., Rojas, Y., Emery, R. J., Delclos, G. L., Markham, C. M., Oluyomi, A. O., Vellani, K., & Levine, N. (2020). Workplace Violence in Outpatient Physician Clinics: A Systematic Review. International Journal of Environmental Research and Public Health, 17, 6587. https://doi.org/10.3390/ijerph17186587

Vellani, K. (2020). "Impressing Your Boss: Using the IAHSS Foundation's Crime Survey and Other Foundation Research to Improve Your Program." International Association of Healthcare Security and Safety, Virtual Conference, September 1, 2020.

Vellani, K. (2020). "2020 Healthcare Crime Survey." International Healthcare Security and Safety Foundation.

Vellani, K. (2019). Strategic Security Management: A Risk Assessment Guide for Decision Makers, Second Edition. Boca Raton, FL: Taylor & Francis CRC Press.

Vellani, K. (2019). "Evidence, Anecdotes, and Actions: A Summary of the 2019 Healthcare Crime Survey and other IAHSS Foundation Research." Journal of Healthcare Protection Management, Volume 35, Number 2, International Association for Healthcare Security & Safety.

Vellani, K. (2019). "2019 Healthcare Crime Survey." International Association of Healthcare Security and Safety, Orlando, FL, May 21, 2019.

Vellani, K. (2019). "How Many Security Officers Do You Need? An Evidence-based Approach to Determining the Industry Average Number of Hospital Security Officers." International Association of Healthcare Security and Safety, Orlando, FL, May 20, 2019.

Vellani, K., D'Angelo, M.S & Wheatley, K. (2019). "Vetting Clients: From First Call Through Final Report." 35th Annual Conference, Miami, FL, International Association of Professional Security Consultants, May 5, 2019.

Vellani, K. (2019). "2019 Healthcare Crime Survey." International Healthcare Security and Safety Foundation.

Vellani, K., Emery, R.J., Conway, S.H. & Pompeii, L.A. (2019). "A Refined Model for Estimating the Industry-Average Number of Security Staff for Hospitals." Journal of Healthcare Protection Management, Volume 35, Number 1, International Association for Healthcare Security & Safety.

Vellani, K. (2018). "Threat Assessment in the Private Sector: Application of the IAPSC Forensic Methodology Threat Assessment Section Outside of Litigation." 34th Annual Conference, San Diego, California, International Association of Professional Security Consultants, April 30, 2018.

Vellani, K. (2017). "Violence Against Healthcare Workers: Persistent Trends and Appropriate Responses." Journal of Healthcare Protection Management, Volume 32, Number 2, International Association for Healthcare Security & Safety.

Vellani, K. (2017). "2017 Healthcare Crime Survey." International Healthcare Security and Safety Foundation.

Vellani, K. (2016). "The Battle against Violence in U.S. Hospitals." Journal of Healthcare Protection Management, Volume 32, Number 2, International Association for Healthcare Security & Safety.

Vellani, K. (2016). "2016 Healthcare Crime Survey." International Healthcare Security and Safety Foundation.

Vellani, K. (2015). "Arming Security Officers" (Panelist). International Association of Healthcare Security and Safety, Houston, Texas, November 13, 2015.

Vellani, K. (2015). "Statistics as a Security Management Tool" in Charles A. Sennewald's Effective Security Management, 6th Edition. Woburn: Elsevier.

Vellani, K. (2015). "Workplace Violence." Greater Houston Industrial Hygiene Council, Houston, TX, June 18, 2015.

Vellani, K. (2015). "Security Risk Assessments." Greater Houston Industrial Hygiene Council, Houston, TX, June 18, 2015.

Vellani, K. (2015). "2015 Healthcare Crime Survey." International Association of Healthcare Security and Safety, St. Louis, MO, May 5, 2015.

Vellani, K. (2015). "2015 Healthcare Crime Survey." International Healthcare Security and Safety Foundation.

Vellani, K., Emery, R.J., & Reingle Gonzalez, J.M. (2015). "A Data-Driven Model for Estimating Industry Average Numbers of Hospital Security Staff." Journal of Healthcare Protection Management, Volume 31, Number 1, International Association for Healthcare Security & Safety.

Vellani, K. (2015). Foreword to Michael S. D'Angelo's From Police to Security Professional: A Guide to a Successful Career Transition. Boca Raton: CRC Press.

Vellani, K. (2014). "Reducing Violence in Healthcare Facilities." International Association of Healthcare Security and Safety, Houston, Texas, July 19, 2014.

Vellani, K. (2014). "2014 Healthcare Crime Survey." International Association of Healthcare Security and Safety, San Diego, CA, May 20, 2014.

Vellani, K. (2014). "2014 Healthcare Crime Survey." International Healthcare Security and Safety Foundation.

Vellani, K. (2014). "Reducing Violence in Healthcare Facilities." Journal of Healthcare Protection Management, Volume 30, Number 1, International Association for Healthcare Security & Safety.

Vellani, K. (2013). "The Business Plan and Successful Security Partnering" Successful Security Consulting Seminar, International Association of Professional Security Consultants and ASIS - International. Chicago, IL, September 23, 2013.

Vellani, K. (2012). "The Need for Effective Consulting Websites" in Charles A. Sennewald's Security Consulting, 4th Edition. Woburn: Elsevier.

Vellani, K. (2012). "Security Staffing: Madness to Methods to Outcomes." International Association of Healthcare Security and Safety, Houston, Texas, October 12, 2012.

Vellani, K., Bates, N. & Kaufer, S. (2012). "Security 2012 – The Latest Trends in Crime Analysis, Security Technology and Management Practices for Inadequate Security Litigators." National Crime Victim Bar Association, New Orleans, LA, September 21, 2012.

Vellani, K., Emery, R.J. & Parker, N. (2012). "Staffing Benchmarks: How Many Security Officers are Enough?" Journal of Healthcare Protection Management, Volume 28, Number 2, International Association for Healthcare Security & Safety.

Vellani, K. (2011). "Using Crime Analysis to Solve Problems in 15 Small Steps." Journal of Healthcare Protection Management, Volume 27, Number 2, International Association for Healthcare Security & Safety.

Vellani, K. (2011). "Crime Analysis: A Framework for Optimizing Security." International Association of Healthcare Security and Safety, Toronto, Ontario, May 24, 2011.

Vellani, K. (2011). "Statistics as a Security Management Tool" in Charles A. Sennewald's Effective Security Management, 5th Edition. Woburn: Butterworth-Heinemann.

Vellani, K. and Gouin, B. (2010). "Security Risk Assessments in the Environment of Care." American Society of Healthcare Risk Management, Tampa, FL, October 15, 2010.

Vellani, K. (2010). "The Business Plan and Successful Security Partnering" Successful Security Consulting Seminar, International Association of Professional Security Consultants and ASIS - International. Dallas, TX, October 11, 2010.

Vellani, K. (2010). "Security Risk Assessments." Texas Regional Conference, The Woodlands, Texas, International Association of Professional Security Consultants, September 15, 2010.

Vellani, K. (2010) "Crime Analysis for Problem Solving Security Professionals in 25 Small Steps." Center for Problem Oriented Policing www.popcenter.org .

Vellani, K. (2010). "Crime Analysis: Assessing Threats to Optimize Security." Threat Analysis Group, LLC. Available via Amazon.com.

Vellani, K. (2010). "Crime Analysis: Optimizing Security in Healthcare Facilities." International Association of Healthcare Security and Safety, Houston, Texas, May 21, 2010.

Vellani, K. (2010). "Crime Analysis: A Framework for Optimizing Security and Assessing Foreseeability." 26th Annual Conference, Savannah, Georgia, International Association of Professional Security Consultants, April 26, 2010.

Vellani, K. (2009). "Security Risk Assessments." Security 101 for Health and Safety Professionals, Southwest Center for Occupational & Environmental Health, School of Public Health, University of Texas, October 29, 2009.

Vellani, K. (2009). "The Business Plan and Successful Security Partnering" Successful Security Consulting Seminar, International Association of Professional Security Consultants and ASIS - International. Anaheim, CA, September 20, 2009; Dallas, TX, October 11, 2010; Orlando, FL, September 18, 2011.

Vellani, K. (2009). "Security Risk Assessments." Healthcare Security: Basic Industry Guidelines, January 2009, International Association for Healthcare Security & Safety.

Vellani, K. (2008). "Data Driven Security." Security Solutions Series, Threat Analysis Group, LLC.

Vellani, K. (2008). "Risk Assessments in the Environment of Care." Wisconsin Healthcare Engineering Association, October 29, 2008.

Vellani, K. (2008). "The Uniform Crime Reporting System" in Charles A. Sennewald and John H. Christman's Retail Crime, Security, and Loss Prevention: An Encyclopedic Reference. Woburn: Butterworth-Heinemann.

Vellani, K. (2008). "Threat Assessment in the Retail Environment" in Charles A. Sennewald and John H. Christman's Retail Crime, Security, and Loss Prevention: An Encyclopedic Reference. Woburn: Butterworth-Heinemann.

Vellani, K. (2007). "Security Risk Assessments." Security 101 for Health and Safety Professionals, Southwest Center for Occupational & Environmental Health, School of Public Health, University of Texas, November 14, 2007.

Vellani, K. and Owles, R.E. (2007). "Vulnerability and Risk Assessments in the Environment of Care." Journal of Healthcare Protection Management, Volume 24, Number 1, International Association for Healthcare Security & Safety.

Vellani, K. (2007). Foreword to Brian Gouin's Physical Security Consulting. Woburn: Butterworth-Heinemann.

Vellani, K. (2007). "The Gentle Art of Threat Assessment." Journal of Healthcare Protection Management, Volume 23, Number 1, International Association for Healthcare Security & Safety.

Vellani, K. (2006). "Crime Analysis" in John J. Fay's Encyclopedia of Security Management: Techniques and Technology, 2nd Edition. Woburn: Butterworth-Heinemann.

Vellani, K. (2006). "Security Risk Assessments in the Environment of Care." International Association of Healthcare Security and Safety, Houston, Texas, May 21, 2010.

Vellani, K. (2006). Strategic Security Management: A Risk Assessment Guide for Decision Makers. Woburn: Butterworth-Heinemann.

Vellani, K. (2006). "Strategic Security Management: Risk Assessments in the Environment of Care." Journal of Healthcare Protection Management, Volume 22, Number 2, International Association for Healthcare Security & Safety.

Vellani, K. (2005). "Certified Security Consultant." Successful Security Consulting Seminar, International Association of Professional Security Consultants. Orlando, FL, September 10, 2005.

Vellani, K. (2005). "Crime and Foreseeability Analysis." The Sentry. American Society for Industrial Security - International: Houston Chapter. June, 2005.

Vellani, K. (2004). "Crime and Foreseeability Analysis." The Independent Security Consultant. International Association of Professional Security Consultants. Fall, 2004.

Vellani, K. and Sennewald, C.A. (2004). Consultants as a Protection Resource, Protection of Assets Manual. Alexandria: ASIS International.

Vellani, K. (2004). "The Business Plan." Successful Security Consulting Seminar, International Association of Professional Security Consultants. Dallas, TX, September 25, 2004; Carefree, AZ, May 7, 2006; San Diego, CA, September 24, 2006.

Vellani, K. (2004). "Writing Effective Proposals" International Association of Professional Security Consultants. Newport Beach, CA, April 27, 2004.

Vellani, K. (2004). “Boosting Performance and Morale.” Security Business Practices Reference, Volume 6, ASIS Council on Business Practices, ASIS International.

Vellani, K. (2004). “Achieving Return on Investment from Crime Analysis.” Security Business Practices Reference, Volume 6, ASIS Council on Business Practices, ASIS International.

Vellani, K. (2003). “Security Solutions for Strip Shopping Centers.” Security Solutions Series, Threat Analysis Group, LLC, 2003.

Vellani, K. (2003). “Security Solutions for Grocery Stores.” Security Solutions Series, Threat Analysis Group, LLC, 2003.

Vellani, K. and Batterson, M. (2003). “Security Solutions for Banks.” Security Solutions Series, Threat Analysis Group, LLC, 2003.

Vellani, K. (2003). “Statistics as a Security Management Tool” in Charles A. Sennewald’s Effective Security Management, 4th Edition. Woburn: Butterworth-Heinemann.

Vellani, K. (2002). “Crime Analysis: The First Step in Creating an Effective Crime Prevention Program.” Security Business Practices Reference, Volume 5, ASIS Council on Business Practices, ASIS International.

Vellani, K. (2002). “Crime Analysis in the Medical Environment.” Workplace Safety Seminar, School of Public Health, University of Texas Health Science Center, December 2, 2002.

Vellani, K. (2002). “Risk Analysis” University of Houston - Downtown. CJ 5360: Security and Crisis Management: Theories and Practices, April 8, 2002.

Vellani, K. (2002). “Crime Analysis Literature: What We Have and Where We Are Going.” Forecaster, International Association of Crime Analysts, Spring 2002.

Vellani, K. (2001). “Rape Zones: Are Some Neighborhoods More Prone To Sexual Assault?” KHOU 11, Houston, Texas. Aired November 25, 2001.

Vellani, K. (2001). “Crime Analysis: The First Step in Creating an Effective Crime Prevention Program.” 47th Annual Seminar & Exhibit, San Antonio, Texas, American Society for Industrial Security, October 1, 2001.

Vellani, K. (2001). “Don’t Let Your Guard Down.” Security Management, American Society for Industrial Security, October 2001. Edited extensively by Security Management editors.

Vellani, K. (March 29, 2000). "Convenience Store Security." Presented to Pakistan Association of Greater Houston (PAGH).

Vellani, K. and Nahoun, N.D. (2001). Applied Crime Analysis. Woburn: Butterworth-Heinemann.

Vellani, K. (2000). "Security + Service = Satisfaction: The Perks of Private Security." Journal of Property Management, Institute of Real Estate Management, May/June 2000.

Vellani, K. (1999). "Crime Stoppers." Journal of Property Management, Institute of Real Estate Management, September/October 1999.

Vellani, K. (1998). "Management Ideas for Preventing Crime: An Analysis of Liability, Site-Specific Crime Prevention, Crime Prevention Through Environmental Design, and Violence Escalation." Sam Houston State University, Huntsville, Texas.

## APPENDIX B: Forensic Methodology

# FORENSIC METHODOLOGY

Rev. January [illegible] 2025

Erin Booker v. The Kroger Co. and John Doe

IAPSC

International Association of Professional Security Consultants

**The International Association of Professional Security Consultants has issued this consensus-based and peer-reviewed[1] Methodology for the guidance of and voluntary use by businesses and individuals who deal or may deal with the issues addressed in the context of third-party premises security litigation, and other security-related cases where the methodology would be helpful. The Forensic Methodology has been reviewed and accepted by several Federal District courts throughout the United States.**

**Table of Contents**


POSITION STATEMENT ..... 3
EVIDENCE REVIEW - THE PROCESS ..... 4
SECURITY RISK ASSESSMENT ..... 5
THREAT ASSESSMENT ..... 6
VULNERABILITY ASSESSMENT/ SECURITY SURVEY ..... 7
ANALYSIS AND OPINIONS ..... 9
BIBLIOGRAPHY/REFERENCES ..... 10
FORENSIC SECURITY COMMITTEE MEMBERS ..... 13
CASES CITING METHODOLOGY ..... 14
REVISION HISTORY ..... 15
ABOUT THE IAPSC ..... 16


Erin Booker v. The Kroger Co. and John Doe

[1] Peer review is defined as evaluation of scientific, academic, or professional work by others working in the same field.

**POSITION STATEMENT**

The International Association of Professional Security Consultants does hereby recognize that its members will be called upon to perform as "Forensic Consultants" and serve as Expert Witnesses in a court of law or other legal proceeding. The purpose of these guidelines is to meet the need for a standardized methodology used in the evaluation of premises security cases.

It is recognized that the task of the Forensic Consultant is one of education. Forensic Consultants will provide their opinion(s) to the client, to opposing counsel during deposition, in response to written interrogatories, in reports, and to the judge and jury at trial or any other lawfully convened hearing. This is done with the goal of making others aware of the security issues and contributing to a just and proper conclusion on the litigation.

The responsibility of the Forensic Consultant lies within our system of justice and the ethics of the security profession. The opinions so offered are made as an objective expert witness/consultant, without any financial or other interest in the outcome of the litigation.

Forensic Consultants will, at all times, be forthright, honest, and precise in evolving the ultimate conclusion(s) and opinion(s). The opinion(s) will be the result of a review of all available, applicable documentation and discovery material presented by all parties to the litigation. Site inspections and analytical procedures generally followed by the Forensic Consultant are described in these guidelines.

The following methodology is to be used in a typical premises security case, including crimes committed by employees; workplace violence; negligent hiring, supervision and retention; negligent training; use of force; invasion of privacy; wrongful arrest and/or imprisonment; wrongful prosecution; and other security-related cases.

The Forensic Consultant is expected to exercise diligence in requesting and/or obtaining information that the Consultant reasonably believes is relevant to the facts and circumstances of the case.

*It is reasonable to expect variations of the steps, with some steps deleted and others added as the facts and circumstances of the case being analyzed warrant. Further, it is reasonable to expect a division of the methodology's steps when more than one expert is retained on behalf of a party.*

Erin Booker v. The Kroger Co. and John Doe

**EVIDENCE REVIEW - THE PROCESS**

In the context of this Guideline, the Forensic Consultant will review and analyze various information, whether produced during the discovery process of the litigation or otherwise obtained through research, common knowledge, investigation, and/or the consultant/expert's experience which allows the Consultant to identify factors leading to an understanding of the crime risks present at the time of the criminal event.

Types of evidence generally available to the Forensic Consultant may include, if relevant, the following:

1. Complaint/Petition and Pleadings
2. Police Report of the subject incident
3. Site and Immediate Vicinity Crime History, including police and security incident reports
4. Interrogatories and Responses
5. Requests for Production of Documents and Responses, discovery motions
6. Requests for Admissions and Responses
7. Affidavits, Witness Statements, and Interviews
8. Depositions with exhibits
9. Expert Witness Reports and Depositions
10. Applicable Medical Records Relating to the Facts of the Incident
11. Photographs, Video and Audio Recordings, etc.
12. Other Related Evidence (e.g., prosecutors file, if available, criminal trial transcript, employee HR files, etc.)
13. Site Plans
14. Applicable standards, codes, and regulations
15. Publications related to the standard of care
16. Lighting plans/diagrams
17. Relevant policies and procedures
18. Security staffing, plans, manuals, post orders and schedules
19. Security services contracts in effect on date of loss
20. Agreements with other security service providers (e.g., off-duty police officers)
21. Background search results of employees/workers

Erin Booker v. The Kroger Co. and John Doe

## SECURITY RISK ASSESSMENT

A security risk assessment is the general process of identifying relevant risks, given the facts of the case, and based on the materials identified in the evidence review process. It is a qualitative, quantitative, or hybrid assessment that seeks to determine the likelihood that criminals could successfully exploit a vulnerability or compromise a security countermeasure.

There are two main components to a security risk assessment: a threat assessment and a vulnerability assessment. The threat assessment is an evaluation of the various sources of crime threats. The vulnerability assessment includes an evaluation of the physical aspects of the facility and an analysis of the overall security program as it relates to the specific facts of the case.

The security survey, along with documented evidence, is how the security measures utilized and/or available at the facility at the time of the incident, which is the subject of the litigation, are identified and analyzed.

A security risk assessment provides the foundation for effectively determining the adequacy of countermeasures employed.

Erin Booker v. The Kroger Co. and John Doe

**THREAT ASSESSMENT**

A threat assessment is an evaluation of events that can adversely affect operations and/or specific assets. Historical information is a primary source for threat assessments, including past criminal and terrorist events. A threat assessment considers actual and inherent threats.

1. Actual Threats - The crime history at the subject property based on data reflecting actual crime data. Depending on the police jurisdiction that serves the subject property, different types of crime records may be available. The most common type of crime record used in a crime risk analysis is Calls for Service. It is important to note that Calls for Service accuracy varies by jurisdiction. Further, changes to incident management and dispatch systems may also impact accuracy even within the same jurisdiction. When assessing relevant crimes, Calls for Service should not be used alone. Offense/Incident Reports are necessary to validate the Calls for Service or dispatch logs, specifically the crime type, crime location, and whether a crime actually occurred. Calls for Service alone, in many jurisdictions, are insufficient for these three elements. Actual threats are a quantitative element of a threat assessment. When assessing actual threats, the following may be considered as deemed relevant by the security expert:

    a. Relevant crimes on the subject property for a three to five-year period prior to the date of the incident.

    b. Relevant crimes in the immediate vicinity of the subject property for a three to five-year period prior to the date of the incident. [Note: There is no single definition of what constitutes an "immediate vicinity" or "neighborhood" around a given property. Often what is available for evaluation from a law enforcement agency depends upon that agency's software programming and/or staff capabilities (e.g., the agency can only provide data for a set size of an area, such as a quarter mile radius).] The IAPSC recognizes that criminology studies and related research have generally found that crime in the area may not be relevant to the subject property.

    c. The expert may consider the relationship between offenders and victims (e.g. interpersonal, domestic, targeted, etc.).

2. Inherent Threats – The crime risk at the subject property as determined by the expert based on the property's characteristics, the expert's research and/or experience in similar environments, information gathered through the discovery process, and/or a site inspection (if conducted).

Erin Booker v. The Kroger Co. and John Doe

**VULNERABILITY ASSESSMENT/ SECURITY SURVEY**

The vulnerability assessment is an analysis of security weaknesses and opportunities for criminal activity. A security survey is a method for collecting information used in the vulnerability assessment.

A security survey may include a physical survey of the scene of the incident and areas/functions that are applicable to the incident to achieve an understanding of information that has potential application to the matter in litigation.

The following areas of review are not meant to be all inclusive, nor all exclusive. The decision to review the material is at the judgment/discretion of the expert.

1. Incident Review

    a. Police incident and investigation report(s)
    b. Security incident report(s)
    c. Medical records (emergency room and/or autopsy as it relates to information about the occurrence of the incident)
    d. Other sources of information about how the incident occurred (e.g., witness statements testimony, etc.)

2. Site Inspection - Inspect the site where the incident occurred and the surrounding area, if relevant. (Note: Not all cases will require site inspections, nor is it always possible to conduct site views e.g., if the site has been altered substantially or no longer exists.) Further, the facts of some cases and potential liability issues are not related to the site/property layout, design, or other physical attributes. As such, a site inspection may be unnecessary.

    a. Determine layout of the premises
    b. Evaluate relevant factors (lighting, lines of sight, places of concealment, remoteness, accessibility, security measures, conditions, etc.)
    c. Review relevant documentation (lease, contract, diagram, map, etc.)
    d. Assess the characteristics of the surrounding area and what impact, if any, those characteristics may have had on the subject property

Erin Booker v. The Kroger Co. and John Doe

3. Security Personnel

   a. Review security officer(s) (including off-duty law enforcement officers) actions, staffing levels, post orders, duty hours, equipment provided, tours, evaluations, training, hiring procedures and supervision
   b. Review of law enforcement presence and actions (e.g., on-duty, police details, etc.)
   c. Review roles and actions of non-security related people who may have participated in the security program and/or incident
   d. Assess the qualifications and performance of owner/management personnel overseeing the security program

4. Security Management Program

   a. Review management and security related policies, procedures, and practices
   b. Review any security risk assessments performed prior to the date of the incident
   c. Review daily activity reports, job descriptions, incident reports and internal correspondence
   d. Review security services contract
   e. Review training manuals and materials
   f. Review depositions regarding employees' understanding of their duties, and all customs and undocumented practices
   g. Evaluate the qualifications, training, and experience of security management and supervisory personnel

5. Security Equipment

   a. Review building design and site plans
   b. Inspect all security devices related to the incident
   c. Inspect structural security features related to the incident
   d. Determine the position, function and maintenance status of the relevant security equipment and features in place at the time of the incident
   e. Determine levels of illumination, if relevant

Erin Booker v. The Kroger Co. and John Doe

## ANALYSIS AND OPINIONS

The security expert will determine the level of adequacy of security at the location of the incident on the date and at the time the incident occurred. This will be based on the information obtained in the previous steps, and the application of a qualitative analysis based on the experience, education, and training of the expert.

Based upon the analysis, the expert will reach conclusions on the issues of risk analysis, preventability, and the adequacy of the security program at the subject property. At this point the expert has formed opinions and is prepared to provide a written report, be deposed, and/or testify at trial. Those opinions will state the detailed basis for the findings, including evidence, standards, best practices, and guidelines, where applicable.

Erin Booker v. The Kroger Co. and John Doe

**BIBLIOGRAPHY/REFERENCES**

The process of evaluating the risk of crime at a specific location or geographical area is widely recognized and has been adopted nationwide by private industry, public law enforcement, municipalities, and other governmental agencies. The following published sources reference the process used to perform a crime risk analysis. *This is not all-inclusive, but a representative sampling of available references.*

This bibliography is not to be construed in any way as an endorsement by the International Association of Professional Security Consultants of the publications or the respective authors.


- ASIS International. (2024). Security risk assessment standard (ASIS SRA-2024). Alexandria, VA.
- Bates, N. D. (1997). Foreseeability of crime and adequacy of security. In Accident prevention manual for business & industry: Security management. National Safety Council.
- Bates, N. D., & Frank, D. A. (2010). Premises security experts and admissibility considerations under Daubert and Kumho: A revised standard. Suffolk Journal of Trial and Appellate Advocacy.
- Broder, J. F., & Tucker, E. (2012). Risk analysis and the security survey (4th ed.). Butterworth-Heinemann.
- Bureau of Justice Statistics. (n.d.). Glossary: Stranger; Nonstranger. U.S. Department of Justice. https://bjs.ojp.gov/glossary
- Caplan, J. M., & Kennedy, L. W. (2016). Risk terrain modeling: Crime prediction and risk reduction. University of California Press.
- Clarke, R. V., & Eck, J. E. (2007). Understanding risky facilities (Problem-Specific Guide Series). Office of Community Oriented Policing Services, U.S. Department of Justice.
- Crowe, T. D., & Fennelly, L. (2013). Crime prevention through environmental design (3rd ed.). Butterworth-Heinemann.
- Department of the Navy, Naval Facilities Engineering Command. (1983). Physical security design manual 13.1. Government Printing Office.
- Eck, J. E., & Weisburd, D. (1995). Crime and place: Crime prevention studies (Vol. 4). Criminal Justice Press.


Erin Booker v. The Kroger Co. and John Doe

- Eck, J. E., Clarke, R. V., & Guerette, R. T. (2007). Risky facilities: Crime concentration in homogeneous sets of establishments and facilities. In G. Farrell et al. (Eds.), Imagination for crime prevention (Crime Prevention Studies, Vol. 21. Criminal Justice Press.

- Eck, J. E., Linning, S. J., & Herold, T. D. (2023). Place management and crime: Ownership and property rights as a source of social control. SpringerBriefs in Criminology.

- Federal Bureau of Investigation. (2004). Uniform crime reporting handbook. U.S. Department of Justice.

- Gottlieb, S., Arenberg, S., & Singh, R. (1998). Crime analysis: From first report to final arrest. Alpha Publishing.

- International Association of Crime Analysts. (2009). Exploring crime analysis (2nd ed.). Book Surge Publishing.

- Madensen, T. D., & Eck, J. E. (2013). Crime places and place management. In F. T. Cullen & P. Wilcox (Eds.), The Oxford handbook of criminological theory. Oxford University Press.

- Miethe, T. D., & McCorkle, R. (2005). Crime profiles: The anatomy of dangerous persons, places, and situations (3rd ed.). Oxford University Press.

- National Crime Prevention Institute. (2001). Understanding crime prevention. Butterworth-Heinemann.

- Sennewald, C. A. (2015). Effective security management (6th ed.). Butterworth-Heinemann.

- Sennewald, C. A. (2012). Security consulting (4th ed.). Butterworth-Heinemann.

- U.S. Army Corps of Engineers. (1990). Security engineering manual: Missouri River Division/Omaha District. U.S. Army Corps of Engineers.

- U.S. Department of Justice. (1995). Vulnerability assessment of federal facilities. Government Printing Office.

- Vellani, K. H. (2020). Strategic security management: A risk assessment guide for decision makers (2nd ed.). CRC Press.

- Vellani, K. H. (2021). Unraveled: An evidence-based approach to understanding and preventing crime. Threat Analysis Group, LLC.


Erin Booker v. The Kroger Co. and John Doe

- Weisburd, D., Groff, E., & Yang, S.-M. (2012). The criminology of place: Street segments and our understanding of the crime problem. Oxford University Press.

- Weisburd, D., Braga, A. A., & Piquero, A. R. (2016). Place matters: Criminology for the twenty-first century. Cambridge University Press.


Erin Booker v. The Kroger Co. and John Doe

## FORENSIC SECURITY COMMITTEE MEMBERS

**Committee Chair**
**Alan W. Zajic, CPP, CSP**
AWZ Consulting

**William J. Birks Jr., CPP, CSC**
William J. Birks Jr. & Associates

**James H. Clark, CPP**
Clark Security Group, LLC

**Michael S. D'Angelo, CPP, CSC, CHPA**
Secure Direction Consulting, LLC

**Steve Kaufer, CPP**
Inter/Action Associates

**Karim Vellani, CPP, CSC**
Threat Analysis Group, LLC

**Vince Vittatoe, CPP, CSC, CPTED**
Vittatoe Consulting, LLC

**Ken Wheatley, MA, CPP**
Royal Security Group, LLC

**Advisory Member**
**Chad Callaghan, CPP, CSC, CLSD**
Premises Liability Experts, LLC

Erin Booker v. The Kroger Co. and John Doe

## CASES CITING METHODOLOGY

Case citations are added as cases come to the attention of the IAPSC Forensic Security Committee. Other cases may exist which address the Forensic Methodology.

- Hawkins v. Cypress Point Apartments, No. 1:19-CV-679-LG-RHW, 2021 WL 6803719 (S.D. Miss. Feb. 12, 2021).
- Doe v. AE Outfitters Retail Co., No. WDQ-14-508, 2015 WL 9255325 (D. Md. Dec. 17, 2015).
- Hopkins v. Nat'l R.R. Passenger Corp., No. 08CV2965NGGRML, 2015 WL 13741721 (E.D.N.Y. Aug. 20, 2015).
- Robles del Valle v. Vornado Realty Tr., No. CV 06-1818 (JAG), 2009 WL 10680876 (D.P.R. July 8, 2009).
- Childress v. Ky. Oaks Mall Co., No. 5:06CV-54-R, 2007 WL 2772299 (W.D. Ky. Sept. 20, 2007).
- Birge v. Dollar Gen. Corp., No. 04-2531 B, (W.D. Tenn. Dec. 29, 2006).

Erin Booker v. The Kroger Co. and John Doe

## REVISION HISTORY

**June 2000**
Initial Release with approval from IAPSC membership in attendance at the annual meeting.

**May 2005**
Revised with approval by the IAPSC membership in attendance at the annual meeting.

**November 2008**
Revised with approval of the Board of Directors.

**November 2011**
Revised by IAPSC Forensic Security Committee – minor formatting changes and added references to bibliography.

**April 2014**
Revised with approval of IAPSC Forensic Security Committee – addition of language to Actual Crime section: “Relevant crimes in the immediate vicinity of the facility (three to five years prior to the date of the incident) as defined by and deemed relevant by the security expert.”

**January 2018**
Revised with approval by the Board of Directors.

**December 2020**
Revised by IAPSC Forensic Security Committee – clarification of “security-related” cases covered by the Methodology and types of evidence available to the Forensic Consultant. Updated list of committee members.

**September 2023**
Revised by IAPSC Forensic Security Committee – added cases citing methodology and references, revised formatting. Updated list of committee members.

**January 2025**
Revised by IAPSC Forensic Security Committee with approval of the Board of Directors. Updated list of committee members.

Erin Booker v. The Kroger Co. and John Doe

**ABOUT THE IAPSC**

Founded in 1984, the International Association of Professional Security Consultants (IAPSC) is a widely recognized and respected association committed to establishing and maintaining the highest standards for security consultants in the industry.

IAPSC members are independent, non-product affiliated consultants who are required to meet strict educational, experience, and practice requirements, ensuring that they uphold the IAPSC code for professionalism and ethical conduct. For more information, to find an IAPSC security consultant, or to become a member of the association, visit www.iapsc.org.

Erin Booker v. The Kroger Co. and John Doe